HIGHLAND COOPERATIVE, Woodbridge Commons, Village Cooperative, Colonial Cooperative, et al.,

v.

The CITY OF LANSING, the State of Michigan Department of Highways and Transportation, and The Federal Highway Administration.

No. G79–53 C.A.

United States District Court, W. D. Michigan, S. D.

July 7, 1980.

John D. Pirich, Lansing, Mich., Gerald E. Rosen, Detroit, Mich., for plaintiffs.

Irena Kalvans, Asst. Atty. Gen., Stephen R. Sawyer, City Atty., Lansing, Mich., Janet T. Neff, Asst. U. S. Atty., Grand Rapids, Mich., for defendants.

## OPINION

FOX, District Judge.

Plaintiffs, four cooperative housing associations and forty-two individual residents, filed suit seeking a preliminary injunction restraining further federal, state and local agency action in the proposed Edgewood Corridor Project which would create a four-lane boulevard bisecting their neighborhood. They request a full scale Environmental Impact Statement (EIS) be prepared and if the results of the EIS are such that the benefits of the project do not outweigh the detrimental environmental harm, and if less damaging alternatives are available, the Court issue a permanent injunction against defendants. Defendants have filed various motions to dismiss or, in the alternative, for summary judgment on the grounds that the Project is not a major federal action significantly affecting the human environment, and thus does not require the filing of an EIS under Section 102(2)(C) of the National Environmental

Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq.

*FACTUAL BACKGROUND*

The proposed Edgewood Boulevard would run parallel to and slightly north of Interstate 96 on the south end of Lansing from South Cedar Street to Logan Street. This approximate two-mile long project would join together three existing segments creating a four-lane highway in a predominately residential area. First planned in 1964 when the land through which it passes was annexed to the City, it was intended that Edgewood Boulevard would serve as an east-west collector, and permit development of vacant land lying immediately to the north of Interstate 96 between South Logan and South Cedar Streets.

In 1974, the Lansing City Council authorized the development of the planned Edgewood Boulevard, and the project was approved for federal funding as a federal-aid highway in 1977. Pursuant to the requirements of 42 U.S.C. § 4332 and the rules and regulations promulgated thereunder, the proposed Edgewood Project was reviewed by the Department of State Highways and Transportation of the State of Michigan (MDSHT) and the Federal Highway Administration (FHWA) and, on April 6, 1977, it was determined that the Edgewood Boulevard project should be classified as a major action, but that the project would not have a significant impact on the human or natural environment of the area. Based upon that finding, it was further determined that only a Negative Declaration Statement (ND) would be required with regard to the Edgewood Boulevard Project.

The plaintiffs are four cooperative housing associations and forty-two individual residents of the area, and reside along the proposed boulevard. Currently, less than three thousand vehicles per day use Edgewood Boulevard, while the major freeway, I–96, lying less than one hundred yards to the south of the proposed project, carries approximately 20,000 vehicles per day over a comparable highway distance.

The majority of land use in the study area consists generally of single-family and multi-family residences. This area had a population of 5,576 persons in 1975, and is predominately residential. Four large areas of undeveloped land also exist in the project area. The Moore Living Center, a school for the physically and mentally handicapped, is located along the proposed project, and its residents presently use the woodlot east of the Center for nature trails.

A Draft ND was prepared in June 1977, and a Final ND was issued in April 1978. In a letter dated May 1, 1978 the State informed the City of Lansing that MDSHT in cooperation with the Federal Highway Administration (FHWA) had reviewed the ND and found it acceptable. On July 18, 1978, MDSHT, along with FHWA, granted location and design approval for the Edgewood Project, and on November 6, 1978, the FHWA granted program approval for the project. The FHWA authorized $120,000 in federal aid funds for title searches and appraisals, and the City entered into contracts totaling $54,763 for this work. Since the filing of this lawsuit, the City has withdrawn its request for all possible additional federal aid, and while they continue to remain eligible for such funding, the City intends to proceed with the acquisition of property utilizing only municipal funds. In a March 31, 1980 letter to MDSHT, the City stated they had budgeted funds to proceed with the acquisition of right-of-ways in July and August 1980, and it was their intent to follow federal regulations pertaining to all acquisition activities. In regards to the acquisition phase, the State warned on April 21, 1980 that although no federal funds would be used, all federal requirements had to be met, and the relocation plan had to be reviewed by MDSHT and submitted to FHWA for their approval.

On its face, the ND states the project will have probable unavoidable adverse impacts on the environment in several respects:

(1) Woodlots: The Project will result in the removal of existing vegetation, and the loss of lowlands, and swampy terrain.

(2) Wildlife: Loss of wildlife cover, resting places, protection of food sources, and reduction of already scarce primary

vegetation will occur. Typical wildlife to be found in this area would include: doves, crows, hawks, songbirds and various waterfowl, cottontail rabbits, grey squirrels, skunks, opossums and racoons.

(3) Surface Water and Drainage: The ND indicates the following impacts will occur: (a) interruption of existing drainage patterns; (b) soil erosion; (c) increase in run-off; (d) injection of chemicals, particularly salts and oil into drainage ways and streams; and (e) reductions of water quality due to erosion.

(4) Landscape: The ND warns that "borrow pits" will be needed to supply fill materials for the highway, and suggests this unsightly result could be cured by turning them into sewage settling ponds.

(5) Air: It is inevitable that increasing automobile demands will add polluting elements to the air.

(6) Noise: The ND states that noise levels will be much higher after construction in the Highlands and Woodbridge Common Cooperatives, and along existing Edgewood Road.

(7) Social Relationships: The relocation of families displaced will have an immeasurable impact on the families and their social relationships in the area.

(8) Economic System: The extension of the Boulevard will add meaningful tax gain to local government from once vacant land, and the taking of some agricultural parcels.

In addition to these environmental impacts described above, the ND also considered several alternatives to the Project. A no-action alternative, while allowing residents the security of having no additional traffic, avoiding displacement of residents and families, and having less harm from an ecological standpoint, was rejected for failing to provide a continuous east-west street in the area as proposed in the City's Transportation Plan. An alternative of using the exit and entrance ramps to I–96 was not considered a viable alternative since the intent of the study was to develop an alignment for Edgewood Boulevard. Several alternative alignments for Edgewood Boulevard were considered. Alternative AB was selected as the best alternative when cost, volume-capacity, residential displacements, noise and air quality impacts, energy savings, social impact, and other factors were considered together. However, the ND noted that a total of sixteen single family residences will be displaced, increased traffic through the Cooperatives will inconvenience vehicular and pedestrian movement, and some woodlots would be lost.

Section 102(2)(C) of the National Environmental Policy Act (NEPA) requires the preparation of a detailed Environmental Impact Statement (EIS) for ". . . every major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332. Thus, the issues presented in this case are, (1) whether the proposed action is a major federal action; (2) if so, does it significantly affect the quality of the human environment; and (3) whether the agency's threshold decision not to issue and prepare an EIS was reasonable.

*MAJOR FEDERAL ACTION*

It is agreed that the proposed improvement, as originally conceived, was a major federal action requiring the preparation of at least an ND. 23 C.F.R. § 771.10(d). This determination was made cooperatively with the FHWA and the guidelines provided in the Federal-Aid Highway Program Manual 7–7–2, and the use of the support material developed by the City of Lansing through its consultant. In a letter dated April 1, 1977 the Division Administrator of the FHWA concurred with local officials that the project was a major federal action, but one that did not significantly affect the quality of the human environment. Therefore, as originally envisioned, it is clear that Edgewood Boulevard Project was major federal action. Subsequently, the City has withdrawn its request for further federal aid, and defendants contend the project is no longer a "federal" action under NEPA. They assert this suit is mooted by failure to obtain federal funding for the first segment of the Edgewood Boulevard corridor.

Defendants charge that a plan cannot be said to be "federal" for the purposes of NEPA where the adoption of the plan in no way obligates the federal government, *Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission*, 599 F.2d 1333, 1347 (5th Cir. 1979), and here, there are no "irreversible and irretrievable commitments of resources to actions affecting the environment," *Sierra Club v. Hathaway*, 579 F.2d 1162, 1168 (9th Cir. 1978), which obligate the federal government.

However, the courts have frequently been concerned about the possibilities of local agencies avoiding the requirements of NEPA. In *Named Ind. Mem. of San Antonio Con. Soc. v. Texas Highway Dept.*, 446 F.2d 1013 (5th Cir. 1971), the State of Texas was going to proceed with a project solely with state funds after suits were brought challenging the failure to meet NEPA requirements. The State argued they would proceed with 100% state money, thus making NEPA inapplicable. The Court stated:

> We are not impressed with this argument. If we were to accept it, we would be giving approval to the circumvention of an Act of Congress. The North Expressway is now a federal project, and it has been a federal project since the Secretary of Transportation authorized federal participation on August 13, 1970. As such the North Expressway is subject to the laws of Congress, and the State as a partner in the construction of the project is bound by those laws. The supremacy of federal law has been recognized as a fundamental principle of our Government . . . . The State may not subvert that principle by a mere change in bookkeeping or by shifting funds from one project to another. (At 1027.)

Many courts have analyzed the strong policy statements and wording of NEPA and the regulations thereunder, and have ruled that common sense requires federal protective devices apply even before any federal funds are sought. As the Court in *LaRaza Unida v. Volpe*, 337 F.Supp. 221, 231 (1971), explained:

> It does little good to shut the barn doors after all the horses have run away. If the federal statutes and regulations are to supply any protection at all it must be prior to the time the residents have left and the deleterious effects to the environment have taken place. All the protections that Congress sought to establish would be futile gestures were a state able to ignore the spirit (and letter) of the various acts and regulations until it actually receives federal funds. Given the realities of actual highway displacement and construction, the statutes and regulations must apply immediately or their purpose will be frustrated.

The Court in *LaRaza Unida, supra,* in reviewing a situation where the state defendants had not received any assurances of federal funding, and where the state asserted it was highly unlikely it would seek federal funds, stated: .

> . . . that for the purpose of applying the various federal statutes and regulations a federal-aid highway is any project for which the state has obtained location approval. The state should not have the considerable benefits that accompany an option to obtain federal funds without also assuming the attendant obligations. Any project that seeks even the possible protection and assistance of the federal government must fall within the statutes and regulations. (At 227.)

*See, also, River v. Richmond Metropolitan Authority*, 359 F.Supp. 611 (E.D.Va.1973); *Sierra Club v. Volpe*, 351 F.Supp. 1002 (N.D.Cal.1972).

In *Scottsdale Mall v. State of Indiana*, 549 F.2d 484 (1977), the Court considered the same issues presented in the instant matter; that is, whether the project was a "major federal action," and whether the state may avoid the requirements of NEPA by withdrawing the project from federal programming. The Court after analyzing the Congressional intent behind NEPA stated there came a point in the ongoing federal-state relationships under the Federal-Aid Highway Act at which the requirements of NEPA must be met. They announced:

Indiana's seeking and receiving federal approval at various stages of the project and receiving preliminary financial benefits so imbued the highway project with a federal character that notwithstanding the state's withdrawal of the project from federal funding consideration, compliance with federal environmental statutes was necessary. (At 489.)

■ In the instant case, Edgewood Boulevard was approved for federal funding in 1977, was reviewed by FHWA and determined it was a major action on April 6, 1977. On May 1, 1978, FHWA reviewed and accepted the ND, and granted location and design approval on November 6, 1978. FHWA authorized $120,000 in federal aid funds for title searches and appraisals, and in reliance on those federal authorizations, the City entered into contracts for the work. While the City has withdrawn its request for any further federal aid, they continue to remain eligible for such funding, and further plans continue to be submitted to FHWA for their approval. Therefore, the federal-local partnership continues despite the withdrawal of requests for further funds. These actions have so imbued the highway project with a federal character that despite the withdrawal, compliance with federal environmental statutes is necessary. The City and State defendants are not allowed to have the considerable benefits that accompany the option to obtain federal funds without assuming the attendant obligations; therefore the Edgewood Boulevard Project must be considered as a "major federal action."

## SUBSTANTIAL ENVIRONMENTAL ISSUES

■ Once it has been determined that a proposed action is a major federal action, the next requirement is that it be one that significantly affects the quality of the human environment. Most courts are in agreement that:

. . . the threshold application of that standard to the facts in the particular case is for the agency. See, e. g., *First National Bank of Chicago v. Rich*

*ardson,* 484 F.2d 1369 (CA 7, 1973), . . . . . . . most courts will review the agency's threshold decision only where the plaintiff raises "substantial environmental issues," that is, alleges facts, which if true, demonstrate the project could significantly affect the quality of the human environment. *Joseph v. Adams,* 467 F.Supp. 141, 151 (E.D.Mich. 1978).

See also *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421 (5th Cir. 1973), and *Mid-Shiawassee County Concerned Citizens v. Train,* 408 F.Supp. 650 (E.D.Mich.1976). Here, from the pleadings, the Negative Declaration, and from the hearing, it is apparent that plaintiffs have raised "substantial environmental issues" which demonstrate the project could significantly affect the quality of the human environment.

FHWA regulations set out the standard for determining what qualifies as a "significant" effect:

(e) The following are examples of types of actions which would ordinarily have a significant effect on the quality of the human environment:

\*　　\*　　\*　　\*　　\*　　\*

(2) An action that is likely to be *highly controversial on the environmental grounds* or with respect to the availability of adequate relocation housing.

\*　　\*　　\*　　\*　　\*　　\*

(4) An action that (i) *causes significant division or disruption of an established community* or disrupts orderly, planned development, or is determined to be significantly inconsistent with plans or goals that have been adopted by the community in which the project is located, as determined by a responsible official(s); or (ii) *causes a significant increase in traffic congestion.*

(5) An action which (i) is determined to be inconsistent with any federal, state or local law or regulation relating to the environment; or (ii) *has a significant detrimental impact on air or water quality or on ambient noise lev*

*els for adjoining areas*; or may contaminate a public water supply system. 23 C.F.R. 771.10(e) (emphasis added). Furthermore, courts have held that the standard for "significantly affecting the quality of the human environment" can be construed as "an action which has an important meaningful effect, direct or indirect, upon a broad range of aspects of human life." *National Resources Defense Council, Inc. v. Grant*, 341 F.Supp. 356, 367 (E.D.N.C.1972).

█ In the instant case, plaintiffs have raised "substantial environmental issues." Plaintiffs need not prove that the project will have a significant effect, they need only "*alleg[e] facts, which if true*, demonstrate the project *could significantly affect* the quality of the human environment." *Joseph v. Adams*, 467 F.Supp. 141, 151 (E.D. Mich.1978) (emphasis added). Plaintiffs contend the cumulative impact of noise, the potential traffic congestion, the disruption of an established community, the safety threat to children and senior citizens, the impact on the students at the Moore Living Center, developmental changes in the use of the land, as well as economic harm to the residents, could significantly affect the quality of the human environment. Thus, it is clear that plaintiffs have raised substantial environmental issues, and this Court may properly review the agency's threshold decision. *Id.* at 151.

## STANDARD OF REVIEW

█ Once substantial environmental issues concerning a proposed project are raised:

. . . the court should proceed to examine and weigh the evidence of both the plaintiff and the agency to determine whether the agency reasonably concluded that the particular project would have no effects which would significantly degrade our environmental quality. . . . If the court concludes that no environmental factor would be significantly degraded by the project, GSA's determination not to file the impact statement should be upheld. On the other hand, if the court finds that the project may cause a significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all), the court should require the filing of an impact statement or grant SOTA such other equitable relief as it deems appropriate. *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (5th Cir. 1973).

See, also, *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421 (5th Cir. 1973).

█ There has been some disagreement over the proper standard to be used in reviewing agency decisions not to require an EIS. While the "arbitrary and capricious" standard has been used, other courts have adopted a more exacting standard and upheld agency decisions only where it is "reasonable." *Joseph v. Adams*, specifically discussed this issue, and held that "the 'reasonableness' standard is better suited to effect environmental policies" (*supra* at 152). This Court concurs in the belief that the "reasonableness" standard is the appropriate one for environmental issues. Any less stringent standard of scrutiny of the FHWA and MDSHT determination that the proposed Boulevard would not significantly impact on the human environment and, therefore, not require an EIS, would allow precisely those people whose primary responsibility it is to build roads to make the decision that the road should be built without detailed consideration of the impact the road would have on the quality of the human environment. While this Court is not free to substitute its judgment for that of the agency, when substantial environmental issues are raised it is proper to inquire into the reasonableness of the agency's determination.

## REASONABLENESS OF AGENCY DECISION

*Joseph v. Adams* reviewed the agency decision according to the criteria set forth in *Maryland-National, etc. Park and Planning Commission v. U. S. Postal Service*, 487 F.2d 1029, 1040 (D.C.Cir.1973). Specifically they considered:

(1) Did the agency take a "hard look" at the problem, as opposed to bald conclusions, unaided by preliminary investigation;

(2) Did the agency identify and adequately investigate the relevant areas of environmental concern;

(3) As to problems studied and identified, does the agency make a convincing case that the impact is insignificant;

(4) If an impact is of true significance, has the agency convincingly established that changes in the project have sufficiently minimized it.

*Joseph v. Adams*, supra at 152.

■ Here, from the ND it is apparent that the agency did not take a "hard look" at some of the major problems raised by plaintiffs, but rather relied on bald conclusions. Plaintiffs have raised concerns about the changes this four-lane urban arterial will have in a residential area. The ND does not take a "hard look" at the problem, but rather praises the meaningful tax gain to local government by potential commercial and residential properties. In fact, the ND declares that "perhaps a regional mall would be created." However, nowhere is there evidence that the agency considered the harm this might create for residents, it only praises the potential tax base increase. The ND is devoid of any discussion of what impact this land development pressure will have on the vacant woodlots, and on the residential aspects of the project area. The ND also failed to take a "hard look" at the cumulative impact on ambient noise levels expected from the proposed Edgewood Boulevard. While there is analysis of the noise levels on I–96, and predictions of the levels on Edgewood, there is no discussion on the cumulative impact these levels will have on a residential area that is to become an island surrounded by four lanes of traffic. Rather, the ND states that although noise levels will be much higher after construction in some areas, this condition is due to the influence of I–96, rather than the proposed Edgewood Boulevard.

■ The ND does not make a convincing case that plaintiffs' substantial environmental issues will have an insignificant impact. Noise is dismissed as insignificant, placing most blame on I–96. However, the introduction of a projected 15,000 cars daily, coupled with the already existing noise from I–96 has not been convincingly shown to be insignificant. This Court is also troubled by the disruption and division of an established neighborhood. The ND states 175 townhouses and Moore Living Center will be located between two major facilities. The health and safety of the residents of this neighborhood will be significantly affected by the introduction of a highway through their community. Another disturbing aspect of the proposed project is the detrimental economic impact it may have. Defendants correctly point out that purely economic issues, by themselves, are not within the zone of interests to be protected by NEPA. But, where the economic interests are interrelated with environmental effects, all effects on the human environment should be considered in an EIS. 40 C.F.R. § 1508.14. That construction of the Edgewood Project would potentially entail severe economic injury for plaintiffs and their Cooperatives is acknowledged at several points in the ND. Yet, these fears are cavalierly dismissed by defendants in the ND when they state that "by advertising the undesireable environmental impacts, prospective residents will naturally reconsider moving into the complexes. The cooperatives should take the more positive approach, that of selling prospective residents on the amenities of the area." Such a casual dismissal of the substantial safety, economic, and traffic fears of the residents of this area is repugnant to the very purposes of NEPA.

Plaintiffs have alleged several substantial issues about the environment. Their affidavits demonstrate the controversial nature of the project, and their claims raise serious questions regarding the impact on the environment, on the disruption of their established community, and on traffic congestion and noise levels. It is not the duty of the Court to declare that this project will significantly degrade these environmental fac-

tors, only that the project may cause a significant degradation of some human environmental factor. *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir. 1973). Therefore, this Court finds the agency failed to reasonably conclude that no significant impact would result to the environment when it failed to take a "hard look" at some of the major problems raised by plaintiffs, and did not convincingly show other issues had only an insignificant impact.

*RELIEF*

The two primary elements which must be shown as predicates to the requirement of an environmental impact statement have been shown here. That is that the action is a major federal action, and that the action significantly affects the quality of the human environment. *Metlakatla Indian Community v. Adams,* 427 F.Supp. 871 (D.D.C. 1977). However, as the Court in *City of Romulus v. County of Wayne,* 392 F.Supp. 578, 594 (E.D.Mich.1975), stated:

> [The] determination that Section 102 requirements have not been met does not create a mandatory blanket right to an injunction. Although the preliminary injunction is the vehicle by which a declared congressional policy can be effectuated, *Environmental Defense Fund v. [T.V.A.],* 468 F.2d 1164 (6th Cir. 1972), *cert. denied* 414 U.S. 1036, 94 S.Ct. 535, 38 L.Ed.2d 327 (1973), general principles of equity are applicable in NEPA cases and these cases will control the Court's discretion. *Environmental Defense Fund, Inc. v. Froehlke,* 348 F.Supp. 338 (W.D.Mo. 1972), *aff'd* 477 F.2d 1033 (8th Cir. 1973).

In the Sixth Circuit, the standards applicable to the issuance of a preliminary injunction are well established. In *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977), the Circuit Court set forth four standards which must be considered:

(1) Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

(2) Whether the plaintiffs have shown irreparable injury;

(3) Whether the issuance of a preliminary injunction would cause substantial harm to others; and

(4) Whether the public interest would be served by issuing a preliminary injunction.

■ Here plaintiffs have shown a substantial likelihood or probability of success on the merits. They have demonstrated that the proposed project is a major federal action, and will have a significant impact on the human environment. Through their affidavits and in the ND, they have shown substantial environmental issues that the agency either failed to take a "hard look" at, or failed to convincingly show were insignificant, and thus have demonstrated that an EIS should be required to more fully investigate environmental impacts, and other reasonable alternatives.

■ Second, the plaintiffs have shown that irreparable injury will result unless an injunction is issued. As indicated in a letter from the State defendant to the City of Lansing, the title search and appraisal phases of the project are almost completed and the acquisition of property stage will commence in July or August 1980. Clearly, irreparable injury will result if the defendants proceed with the buying of right-of-ways and displacing families from their homes. Further, the Sixth Circuit has held that a violation of NEPA per se establishes irreparable injury sufficient to grant preliminary injunctive relief. *Environmental Defense Fund v. Tennessee Valley Authority,* 468 F.2d 1164, 1184 (6th Cir. 1972). In that case, the Sixth Circuit noted in granting the injunction that "the more time and resources appellants (the TVA) are allowed to invest in this project, the greater becomes the likelihood that compliance with Section 102 of NEPA, and the reconsideration of the project . . . will prove to be merely an empty gesture." *Id.* at 1183–84.

■ The third factor to consider is whether the issuance of a preliminary injunction will cause substantial harm to others. Here, it clearly would not. The acquisition of property and the letting of con-

struction contracts, while imminent, has not yet begun. Therefore, no third parties will be harmed by an injunction. Further, the City of Lansing contends that the Edgewood Project has been on the Master Plan since 1958, so it does not seem that the defendants would be harmed by restraining any further action until a more detailed environmental analysis can be made. While the delay in a construction project will almost invariably result in an increase in the eventual costs, those costs cannot be said to be a substantial harm.

■ Finally, the public interest would be best served by the issuance of a preliminary injunction. The Congressional policy behind NEPA, to insure that the quality of the human environment is protected, and the optimally beneficial action is finally taken, can only be met if an injunction is issued preventing further action until the substantial issues have been looked at. The residents of Lansing have been able to exist for years without an Edgewood Boulevard, and it would seem they could manage until a more thorough analysis of plaintiffs' substantial environmental issues could be obtained. The public interest in the quality of life, and in the efficient use of government resources warrants this thorough analysis of environmental issues before any irretrievable or irrevocable commitment of resources is made.

Defendant City of Lansing argues that if an injunction is to be issued, then it is only proper to enjoin phase two (from Washington to Logan Streets) of the project, and not phase one (from Cedar to Washington Streets). Defendant charges that no allegations of any adverse impact have been made towards phase one, that phase one will not result in the displacement of any residents of the cooperatives, and that the single-home owners whose properties will be purchased with the right-of-way acquisition in phase one are not particularly opposed to the project. Defendant urges that phase one will have the effect of opening up and promoting the development of substantial areas of land between South Cedar and South Washington, and this develop-

ment will serve the interests of the public by promoting expansion of the tax base.

■ A court has a great deal of discretion in determining if a preliminary injunction should be denied or granted. As the Sixth Circuit has ruled:

> The granting or denial of a preliminary injunction pending final hearing on the merits is within the sound discretion of the District Court. On appeal, the action of the District Judge in granting or denying a preliminary injunction will not be disturbed unless contrary to some rule of equity or the result of improvident exercise of judicial discretion. *Oliver v. School District of City of Kalamazoo*, 448 F.2d 635, 636 (6th Cir. 1971).

Even though the granting of a preliminary injunction is entirely within the discretion of the court, it is an extraordinary remedy, and should be rendered with great caution.

■ While defendants argue that the injunction should issue only as to phase two of the project, this court is cognizant of consistent holdings that the piecemealing of highways, without assessing the consequential environmental effects violates the spirit and letter of NEPA. See, e. g., *Indian Lookout Alliance v. Volpe*, 484 F.2d 11 (8th Cir. 1973); *Thompson v. Fugate*, 347 F.Supp. 120 (E.D.Va.1972); *Named Ind. Mem. of San Antonio Con. Soc. v. Texas Highway Department*, 446 F.2d 1013 (5th Cir. 1971); *Appalachian Mountain Clubs v. Brinegar*, 394 F.Supp. 105 (D.N.H.1975). As envisioned, the Edgewood Boulevard Project was one project to provide an east-west arterial between South Logan and South Cedar. This court is reluctant to now allow half the project to evade NEPA requirements. One of plaintiffs' substantial concerns was developmental changes in land use in what is essentially a residential area. This issue, and the effect it would have on the human environment could completely evade investigation if phase one is allowed to proceed while an EIS is prepared for phase two. The Edgewood Boulevard Project was conceived of as one project, initially studied as one project, and the implementation of any part of it would have

potential environmental impact on the whole area. To allow defendants to make a substantial commitment of resources to one segment, while preparing the EIS for the other would be to avoid the spirit and letter of NEPA, and this Court in its discretion will not allow that to be done.

Under Rule 65(c), "no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant." Rule 65(c) further states the security required shall be "in such sum as the court deems proper for payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Here, defendants have not shown that they will suffer more than negligible harm as a result of delaying the project while an EIS is prepared. Because of the strong public interest, the negligible harm to defendants, and the strong NEPA policies, no bond will be required of plaintiffs.

Motions to dismiss, or in the alternative for summary judgment, are denied. A preliminary injunction is issued restraining defendants from acquiring the rights-of-way, awarding construction contracts, commencing construction, or in any other way proceeding with the Edgewood Project pending the preparation and issuance of an Environmental Impact Statement.