**Cordell SMITH and wife, Fannie Smith,**

v.

**CITY OF COOKEVILLE, a municipal corporation, et al.**

**No. 74–10–NE–CV.**

United States District Court,
M. D. Tennessee,
Northeastern Division.

Aug. 29, 1974.

Joseph L. Lackey, Jr., Nashville, Tenn., for plaintiffs.

John H. Poteet, Cookeville, Tenn., Charles H. Anderson, U. S. Atty., Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, District Judge.

Plaintiffs Cordell Smith and Fannie Smith own a tract of land in Cookeville, Putnam County, Tennessee, which is being condemned by the City of Cookeville for use in the Cane Creek Improvement Project, a proposed conservation and recreation development. Defendants are the City of Cookeville, Tennessee, and Bethel Newport, City Manager; the Putnam County Soil Conservation District; the United States Department of Agriculture, Earl Butz, Secretary of Agriculture; and the United States Department of Housing and Urban Development, James T. Lynn, Secretary of Housing and Urban Development.

Plaintiffs seek to enjoin further construction of the Cane Creek Improve-

ment Project, and they allege jurisdiction pursuant to 5 U.S.C. § 701 et seq. and the National Environmental Policy Act (NEPA), Title 42 U.S.C. § 4321 et seq., and the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4601 et seq. Specifically they allege that no environmental impact statement as required by § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), has been filed by the defendant federal agencies to this action and that they have not been offered relocation benefits in conjunction with the condemnation of their property. Plaintiffs have standing to bring this action. See Environmental Defense Fund v. Tennessee Val. Auth., 468 F.2d 1164 (6th Cir. 1972).

### Background

A study of the Cane Creek basin was made by the Soil Conservation Service (SCS) of the United States Department of Agriculture, for the Hull-York Lakeland Resource Conservation and Development Project, which was created under the authority of the Food and Agriculture Act of 1962, 7 U.S.C. § 1010, and the Bankhead-Jones Farm Tenant Act, 7 U.S.C. § 1011. The project was approved by the Secretary of Agriculture in 1965, and the study conducted in 1966. The Hull-York Lakeland Association proposed, as a result of the study, that the Cane Creek watershed be developed for flood control and recreation.

A water resource survey was conducted in the Cane Creek watershed under the Appalachian Regional Development Act of 1965, 40 U.S.C. § 101 et seq. The purpose of this study was to inventory water and related land resources in an effort to achieve full development potential of the economic and social environment of the watershed area. From this survey came a 1967 SCS report outlining a level of development which included a multiple-purpose dam for flood control and recreation.

In 1968 the City of Cookeville was designated as eligible for federal assistance under the Demonstration Cities and Metropolitan Development Program (Model Cities), 42 U.S.C. § 3301 et seq., and in 1970 the City of Cookeville submitted a five-year comprehensive program to the Secretary of the United States Department of Housing and Urban Development (HUD). The Model Cities Program provides local governments with grants which may be used to share costs with other state and federal programs in projects which serve the objectives of the Model Cities Program. The project plan, Exhibit C at page 7 provides:

"A five year Model Cities Comprehensive Program for Cookeville was submitted on May 8, 1970. The focal point of this plan is to improve the depressed, low-income, under privileged and poverty stricken area in the western limits of Cookeville. The major portion of this area of Cookeville is in the project measure improvement area. The Model Cities Act provides grants to assist local entities of government to cost share with other State and Federal programs in projects or facilities for improvement of education, *housing*, sanitation, water, recreation, *community facilities* and law enforcement." (Emphasis Supplied)

Exhibit C at page 13 provides:

"*Recreation*: Farm ponds and a few private lakes are the only source of water-based recreation within the project measure area. Cookeville is located near the center of a triangle connecting three large Corps of Engineers reservoirs. They are Dale Hollow, 40 miles north; Center Hill, 25 miles south; and Cordell Hull, 25 miles west.

There is an urgent need for a water-based recreational development located within close proximity to the west portion of the Cookeville city limits. A model cities comprehensive plan of development recognized this need and recommended to Cookeville that it be given a higher priority. The Cane Creek water-based recreational development will be within walking dis-

tance for the 1,500 people living within the focal point of the model cities area of development.

The social and economic aspects of this depressed, low-income, under privileged, and poverty stricken area will not allow their enjoying one of the large Corps of Engineers recreational complexes.

In addition, the need for a recreational development in the Cookeville area is part of the statewide comprehensive recreation plan prepared for use by the Land and Water Conservation Fund Act of 1965."

Exhibit C at page 19 states:

"The basic facilities to be installed on the 19-acre recreational area will include picnic areas, roads, parking, sanitary facilities, water and lighting utilities, shelter, landscaping, and fencing."

Of the project's estimated cost of $1,000,000, flood prevention measures comprise approximately $260,000 and recreational facilities about $550,000.

The City of Cookeville and the SCS discussed the feasibility and need for a water based recreation area and a flood control project on Cane Creek, and the city expressed an interest in sponsoring a Resource Conservation and Development Project. The Putnam County Soil Conservation District likewise became a sponsor of the project, and in 1971, the sponsors, with primary assistance from the SCS, prepared a Project Measure Work Plan for Flood Prevention and Water Management on Cane Creek, Putnam County, Tennessee. The Cane Creek Improvement Project Measure Work Plan proposed that a multi-purpose dam be built to impound the waters of Cane Creek in a 56 acre lake. A recreation area would be constructed adjacent to the lake.

Funding for the project was to be provided by the City of Cookeville and the SCS. The SCS was to utilize federal funds allocated for resource conservation and development projects, and the

City of Cookeville was to supply the major part of its share of the cost from its Model Cities program grant from the federal government.

It was further determined that the proposed project was in accordance with the Tennessee Statewide Outdoor Recreation Plan as developed by the Tennessee Department of Conservation.

Prior to February, 1974, the Cookeville city dump was located in an area adjacent to Cane Creek, but by 1971, the city began to look for a new site due to the inavailability of land for expansion around the existing landfill. A selected site was approved by the Tennessee Department of Public Health and was purchased by the Putnam County Quarterly Court in July, 1973. Use of the old landfill was discontinued in February, 1974, and Cookeville has secured technical assistance from the TVA and SCS in attempting to effectively close the site.

*Statutes and Regulations*

I. The Uniform Relocation Assistance and Real Property Acquisition Act.

Title 42, United States Code, Section 4625.

(a) Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall provide a relocation assistance advisory program for displaced persons which shall offer the services described in subsection (c) of this section. If such agency head determines that any person occupying property immediately adjacent to the real property acquired is caused substantial economic injury because of the acquisition, he may offer such person relocation advisory services under such program.

(b) Federal agencies administering programs which may be of assistance to displaced persons covered by this chapter shall cooperate to the maximum extent feasible with the Federal or State agency causing the displacement to as-

sure that such displaced persons receive the maximum assistance available to them.

(c) Each relocation assistance advisory program required by subsection (a) of this section shall include such measures, facilities, or services as may be necessary or appropriate in order to—

(1) determine the need, if any, of displaced persons, for relocation assistance;

(2) provide current and continuing information on the availability, prices, and rentals, of comparable decent, safe, and sanitary sales and rental housing, and of comparable commercial properties and locations for displaced businesses;

(3) assure that, within a reasonable period of time, prior to displacement there will be available in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe, and sanitary dwellings, as defined by such Federal agency head, equal in number to the number of and available to such displaced persons who require such dwellings and reasonably accessible to their places of employment, except that the head of that Federal agency may prescribe by regulation situations when such assurances may be waived;

(4) assist a displaced person displaced from his business or farm operation in obtaining and becoming established in a suitable replacement location;

(5) supply information concerning Federal and State housing programs, disaster loan programs, and other Federal or State programs offering assistance to displaced persons; and

(6) provide other advisory services to displaced persons in order to minimize hardships to such persons in adjusting to relocation.

(d) The heads of Federal agencies shall coordinate relocation activities with project work, and other planned or proposed governmental actions in the community or nearby areas which may affect the carrying out of relocation assistance programs.

Title 42, United States Code, Section 4633.

(a) In order to promote uniform and effective administration of relocation assistance and land acquisition of State or local housing agencies, or other agencies having programs or projects by Federal agencies or programs or projects by State agencies receiving Federal financial assistance, the heads of Federal agencies shall consult together on the establishment of regulations and procedures for the implementation of such programs.

(b) The head of each Federal agency is authorized to establish such regulations and procedures as he may determine to be necessary to assure—

(1) that the payments and assistance authorized by this chapter shall be administered in a manner which is fair and reasonable, and as uniform as practicable;

(2) that a displaced person who makes proper application for a payment authorized for such person by this subchapter shall be paid promptly after a move or, in hardship cases, be paid in advance; and

(3) that any person aggrieved by a determination as to eligibility for a payment authorized by this chapter, or the amount of a payment, may have his application reviewed by the head of the Federal agency having authority over the applicable program or project, or in the case of a program or project receiving Federal financial assistance, by the head of the State agency.

(c) The head of each Federal agency may prescribe such other regulations and procedures, consistent with the provisions of this chapter, as he deems necessary or appropriate to carry out this chapter.

Title 24, Code of Federal Regulations, Section 42.225.

§ 42.225   Right of review.

Any claimant, meaning a person aggrieved by a determination as to eligibility for, or the amount of, a payment under the regulations in this part, may have his claim reviewed and reconsidered by the head of the State agency or his authorized designee (other than the person who made the determination in question) in accordance with the procedures set forth in this subpart, as supplemented by such procedures as the State agency shall have established for such review and reconsideration. Where such a person is not satisfied with the State agency's determination after such review and reconsideration, he is entitled to review of his claim by HUD. Any person or class of persons may similarly seek review and revision of any schedule with respect to payments under the regulations in this part. All the provisions of this subpart shall be fully applicable to such claims for review and revision of any schedule with respect to payments under the regulations in this part.

Title 24, Code of Federal Regulations, Section 42.290.

§ 42.290 Judicial review.

Nothing in this subpart shall in any way preclude or limit a claimant from seeking judicial review or receiving a fair and impartial consideration of his claim on its merits upon exhaustion of such administrative remedies as are available to him under this subpart.

II. The National Environmental Policy Act.

Title 42, United States Code, Section 4332.

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on— .

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposals through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by subchapter II of this chapter.

### Relocation Benefits

A relocation plan was developed as a part of the Cookeville Model Cities plan for those displaced by the acquisition of land for the Cane Creek Project. Cordell Smith was personally contacted by a City of Cookeville representative and informed of available relocation benefits. He was also mailed materials relating to the project and describing relocation benefits available to farming operations. Smith refused to cooperate with city representatives, and stated that he had no intention of moving and therefore did not need relocation assistance and benefits.

■ The Uniform Relocation Assistance and Real Property Acquisition Policies Act and the regulations thereunder provide administrative remedies for persons aggrieved by actions within the purview of the Act. 42 U.S.C. § 4633; 24 CFR § 42.225. Judicial review is appropriate only after administrative remedies have been exhausted.

■ In this case plaintiff has refused the assistance which has been offered. Therefore, he cannot assert that the City of Cookeville has failed to provide him with relocation assistance and thereby seek to invalidate the project and enjoin further construction. Furthermore, plaintiff has failed to exercise the administrative remedies available to him, and without having exhausted those remedies, he is not entitled to seek relocation benefits in this court.

### Environmental Analysis

Putnam County is a small county in the central portion of Tennessee with a population of 35,487, according to the 1970 census. Cookeville, the county seat, has a population of approximately 20,000 and, in light of its rapid growth in recent years, has a projected population of 50,000 in the near future. Cookeville is the major trading center of a several county area, and is the home of Tennessee Technological University, an institution attended by several thousand students.

Cane Creek originates in Cookeville, and the challenged project calls for damming of the creek to create a 56 acre lake and construction of an adjacent recreational area of 19 acres. Thirty thousand people reside within a 5 mile radius of the lake site, and it is anticipated that as many as 26,000 people will utilize the recreational site each year. Along Cane Creek and in the vicinity of the proposed lake approximately 1,500 people live on some 300 parcels of land which do not have sanitary sewer systems and which therefore use septic tanks and privies. In addition to these home sites, three area manufacturing plants, employing approximately 350 people, are currently using septic tank sewerage disposal systems. Vacant lots and roadsides in the area are commonly used by residents as disposal sites for garbage, trash, junk and other refuse.

The Cookeville city dump lies at the head of the proposed lake site. While the dump is no longer being used and is

scheduled for filling in, there are numerous streams of fluids from this landfill draining into Cane Creek. Tests reveal that this fluid discharge contains mercury and arsenic which, prior to dilution with the waters of Cane Creek, exceed human tolerance levels. Therefore, as the situation currently exists, the fish population of the proposed lake could become contaminated.

Cane Creek drains an area of approximately 15,100 acres, which has a strongly rolling to steep topography. It has a flood plain of approximately 8,000 acres, and the Cane Creek Improvement Project will provide flood control benefits for approximately six miles along Cane Creek below the project. An approximate total of 4540 acres will benefit directly from the project, including about 730 acres of floodplain and 3810 acres of upland. There are about 90 farmers in the project area. The project will not affect wildlife habitat in any portion of the project area except in the immediate vicinity of the dam and lake, due to the use of 56 acres of land for the lake and 19 acres for the recreational area.

The total estimated installation cost of the project is approximately $1,000,000, which includes land treatment measures at an estimated cost of $182,500 and structural measures at an estimated cost of $815,000.

The Cane Creek project is one of the steps incorporated in Cookeville's five-year Model Cities program which also includes housing, community facilities and other improvements. No evidence was introduced as to the extent, status or cost of the entire project, nor was it asserted that an environmental impact statement for the entire Model Cities program has been prepared.

The Department of Agriculture, acting through the SCS, is the principal planning agency for the Cane Creek Improvement Project as a Resource Conservation and Development Project and will provide approximately 55% of the installation cost, the largest cost factor of the project. HUD will supply much of the portion of project cost allocated to the City of Cookeville through the Model Cities program grant. The parties advocate that, because of the amount of financial assistance it will provide, the Department of Agriculture has the responsibility for considering the environmental impact of the project and complying with statutory procedures. However, the court does not have sufficient evidence before it to make this determination.

The SCS has established procedures and guidelines for preparation of environmental statements. Advisory RC & D–17, prepared by the Administrator of the SCS, contains guidelines for Resource Conservation and Development projects for determining whether environmental statements are required. The advisory, dated June 14, 1971, outlines certain types of projects which can be considered for exclusion from "major federal actions." Included are project measures which are small in scale and have impact limited to the geographical area of the sponsoring governmental unit and which are designed for any of the following purposes: (1) recreation development; (2) floodwater retardation and single or multiple-purpose water storage; (3) land drainage; (4) fish and wildlife development. The State Conservationist (of the Department of Agriculture) is charged with making a decision on the need for an impact statement on each such project.

On July 2, 1971, the State Conservationist advised the Administrator of the SCS that in his judgment an environmental impact statement was not required for the Cane Creek Improvement Project. This opinion was based, at least in part, upon a draft environmental statement which had been prepared from the data contained in the Project Measure Work Plan. This document, entitled United States Department of Agriculture Environmental Statement, was not dated or signed and was not circulated. In particular, it does not represent an attempt to comply with the pro-

cedural steps necessary to prepare and finalize an impact statement.

An analysis of the document appears in order. It consists of sixteen pages, the first ten of which are devoted basically to a description of the project. Thereafter, the impact analysis, consisting of six letter-sized, double-spaced pages, deals generally with:

A. Favorable Impact:
  (1) Flood control
  (2) Sediment and erosion control
  (3) Recognition of recreational possibilities
  (4) Wild life and fishery
  (5) Aesthetic value

B. Adverse Impact
  (1) Temporary destruction of vegetative cover on 5 acres of pasture and 5 acres of woodland
  (2) Destruction of vegetative cover on 31 acres of pasture and 25 acres of woodland by reason of formation of the 56 acre lake
  (3) Loss of agriculture use of lake area and construction area
  (4) Loss of wild life habitat in lake and recreational area
  (5) Loss of minnows in 0.8 miles of stream

To the court, some of the more obvious considerations worthy of examination, but not mentioned in the Department of Agriculture's environmental statement include:

(1) Breakdown of the 26,000 persons anticipated to use the facility annually into local residents and visitors from other areas;

(2) Effect on the Cookeville crime rate by the influx of visitors to the recreational area;

(3) Additional air pollution caused by increased automobile traffic;

(4) Analysis of additional public accommodations needed to serve visitors to the area;

(5) Availability of fuel for visitors;

(6) Adequacy of existing roads to the project area;

(7) Extent and effect of potential water pollution in the lake. In this regard, the Department of Agriculture Environmental Statement contains a statement that "water quality standards of the Tennessee Department of Health will be met and maintained for the water stored for recreational use." However, the document does not outline pollution control measures, the cost thereof, or the effects of failure to control potential pollution from septic tanks and privies. Additionally, even though the location of the city dump was known, the testimony before this court revealed that personnel of the SCS were unaware of the existence of mercury and arsenic pollutants draining from the dump.

The above list is not intended to be exhaustive. However, it should be obvious that before a determination is made that the proposed project will not significantly affect the quality of the human environment, there must be a good faith effort to analyze in some detail the consequences which may be expected to affect the everyday living environment of the people in the project area. The agency representatives attempted to bolster their analysis by asserting in their testimony that many factors, other than those listed, were considered in determining that there would be no significant impact on the human environment. The court cannot accept this, in essence, "after-the-fact" boot strapping effort which could, in many cases, effectively subvert congressional intent and the purposes of NEPA.

As hereinbefore stated, there has been no attempt to determine the environmental impact of the five year model cities program which by its terms includes the major portion, if not all, of the present lake project.

### Standard of Review

In deciding to uphold the State Conservationist's decision that an environmental impact statement is un-

warranted in the Cane Creek project, the court must be able to find, *inter alia*, that the conclusion was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and that it was not "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). In conducting this review, "the generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S. Ct. 814, 823, 28 L.Ed.2d 136 (1971). While, as always, the agency determination in this case is entitled to a presumption of regularity, " . . . that presumption is not to shield . . . [the decision] from a thorough, probing, in-depth review." *Id.* In the final analysis, the court must look to see " . . . whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824.

Section 102(2)(C) of NEPA requires federal agencies to prepare environmental impact statements for those "proposals for legislation and other *major* Federal actions *significantly* affecting the quality of the human environment. . . ." (emphasis supplied). 42 U.S. C. § 4332(2)(C). The Act does not define either "major" or "significant," and it has been left to the courts to determine, on a case by case basis, activity which falls within the purview of § 102(2)(C). Congress was most explicit, however, in expressing the national environmental policies sought to be advanced by NEPA. Section 101(a), 42 U.S.C. § 4331(a), expresses congressional commitment to a

"continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."

To this end, § 101(b) imposes a "continuing responsibility" on the Government "to use all practicable means . . . to improve and coordinate Federal plans, functions, programs, and resources" to achieve, among other goals, "the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. § 4331(b)(3).

With these policies and goals in mind it thus becomes possible to construe "major" and "significant"

" . . . in the context of a clearly expressed congressional purpose that federal agencies accord environmental values a high priority in their decision-making processes. When there is doubt about the meaning of a particular statutory term, courts must construe that term to give effect to the intent of Congress. Saxon v. Georgia Association of Independent Insurance Agents, 399 F.2d 1010, 1015 (5th Cir. 1968)." Environmental Defense Fund v. Tennessee Val. Auth., *supra.* 468 F. 2d at 1176.

In seeking to give effect to congressional intent,

"Section 102, then, by establishing specific procedures to be followed, makes it possible for courts to determine objectively whether federal officials have carried out the mandate of Congress to accord a high priority to environmental factors." *Id.* at 1175.

Although "major" and "significant" may overlap somewhat in an assessment of federal action under NEPA, strictly speaking each is a separate concept within the context of § 102(2)(C). "Major" federal action has been characterized as activity requiring substantial planning, time, resources, or expenditure. Citizens Organized to Defend En-

vironment, Inc. v. Volpe, 353 F.Supp. 520, 540 (S.D.Ohio 1972); Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. 356, 366–367 (E.D.N.C. 1972).

▮ The Cane Creek Improvement Project will cost an estimated $1,000,000, of which the Department of Agriculture will contribute approximately 55%. However, this recreational development is a part by both planning and funding, of the Cookeville model cities program, a considerably larger undertaking in which HUD will play a significant role. In this connection, the Council on Environmental Quality has established the following guideline:

> "The statutory clause 'major Federal actions significantly affecting the quality of the human environment' is to be construed by agencies with a view of the overall, cumulative impact of the action proposed, related Federal actions and projects in the area, and further actions contemplated. . . . In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable.
> CEQ Guideline § 1500.6(a), 38 Fed. Reg. 20550, 20551 (1973), *to be codified* as 40 CFR § 1500.6(a)."

Work on the model cities program, including the Cane Creek development, spans a period in excess of five years and involves extensive federal participation in terms of both planning and financing. Thus, regardless of whether the Cane Creek Project, considered alone, would constitute "major" federal action, the court concludes that as a part of a larger federal program encompassing housing, community facilities and other improvements, the project under consideration is "major" within the meaning of § 102(2)(C).

The court further concludes that the Cane Creek project constitutes activity "significantly affecting the quality of the human environment" in the Cookeville locale. Activity having a significant environmental impact has been said to be that which

> " . . . can be construed as having an important or meaningful effect, direct or indirect, upon a broad range of aspects of the human environment. The cumulative impact with other projects must be considered. Any action that substantially affects, beneficially or detrimentally, the depth or course of streams, plant life, wildlife habitats, fish and wildlife, and the soil and air 'significantly affects the quality of the human environment'." Natural Resources Defense Council, Inc. v. Grant, *supra*. 341 F.Supp. at 367.

Of additional assistance in assessing the significance of environmental considerations is the following Council on Environmental Quality guideline:

> "[NEPA] also indicates that adverse significant effects include those that degrade the quality of the environment, curtail the range of beneficial uses of the environment, and serve short-term, to the disadvantage of long-term, environmental goals. Significant effects can also include actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial. Significant effects also include secondary effects . . . . The significance of a proposed action may also vary with the setting, with the result that an action that would have little impact in an urban area may be significant in a rural setting or vice versa.
> CEQ Guideline § 1500.6(b), 38 Fed. Reg. 20550, 20551 (1973), *to be codified* as 40 CFR § 1500.6(b)."

Within the above framework, the court finds that the Cane Creek project bears the attributes of federal activity for which Congress, in NEPA, intended environmental impact statements to be prepared. The proposed lake and sur-

rounding recreational area may be expected to have environmental effects which are, for the most part, desirable. Nevertheless, NEPA requires careful study and the preparation of an impact statement for proposed action which has even a significant beneficial impact upon the quality of man's environment. See Natural Resources Defense Council, Inc. v. Grant, *supra*; CEQ Guideline § 1500.6(b), *supra*.

There are undesirable effects of the project, some of which are naturally associated with the creation of a body of water on hitherto pasture and forest acreage. In addition to these effects, there also exists the possibility that the lake may become contaminated with arsenic and mercury poison if such continue to drain from the former Cookeville city dump.

Additional consideration must be given to the indirect or secondary effects of proposed action, including those of a socio-economic nature. The court has previously set out a few factors which appear relevant to an environmental impact analysis in this case, but which were not explored in the environmental statement prepared by the Department of Agriculture. These factors may or may not ultimately prove to have a significant environmental bearing, but agency consideration of the various impacts of proposed action, together with the impact of proposed actions of other agencies, is fundamental to the policies underlying NEPA. As stated in City of New York v. United States, 337 F.Supp. 150, 160 (E.D.N.Y.1972):

" . . . the legislative history indicates that one of the strong motivating forces behind NEPA, and § 102 in particular, was to make exploration and consideration of environmental factors an integral part of the administrative decision-making process. See S.Rep. No. 91–296, 91st Cong., 1st Sess., U.S.Code Cong. & Admin.News, p. 2751; 115 Cong.Rec. 40416 (Dec. 20, 1969) (remarks of Senator Jackson). See also Calvert Cliffs', *supra*, 146 U.S.App.D.C. 33, 449 F.2d 1109 at 1112–1114. To permit an agency to ignore its duties under NEPA with impunity because we have serious doubts that its ultimate decision will be affected by compliance would subvert the very purpose of the Act and encourage further administrative laxity in this area."

The record reveals that many of the immediate and long range effects of the Cane Creek development have received at best superficial analysis by the agencies involved. On review of this record, the court concludes that the defendant federal agencies, in failing to take into consideration all relevant factors, were "arbitrary and capricious," and "failed to observe procedures required by law." See Citizens to Preserve Overton Park, Inc. v. Volpe, *supra*, 401 U.S. at 416, 91 S.Ct. 814, Hanley v. Mitchell, 460 F.2d 640, 648 (2nd Cir. 1972). While this conclusion would not, in all cases, automatically mandate an order requiring the preparation of a formal environmental impact statement at this point, see Hanley v. Mitchell, *supra* at 648, the court further concludes, on the basis of evidence received thus far, that an impact statement in this case is required by § 102(2)(C).

This decision is based largely upon the cumulative impact of the Cane Creek project and the Model Cities program upon environmental amenities in the Cookeville area, particularly with a view to the relative size and population density of the project area. To some extent at least, the requirements of § 102(2)(C) must be assessed within the context of the size of the affected area and the life styles of its inhabitants. What is environmentally significant in Cookeville, Tennessee, may be insignificant in New York City, or vice versa. The estimated 30,000 people living within 5 miles of the proposed lake site represent nearly 90% of the entire population of Putnam County. The Cane Creek development can reasonably be expected to have a significant impact upon the overall living environment of these persons. Cane Creek will be fed by the

proposed lake and flow thenceforth through the southwest portion of the county where it can be expected to affect the health and welfare of adjacent landowners. Several environmental factors not considered in defendants' environmental statement have previously been adverted to and are considered by the court to have a significant bearing upon the effects of the proposed action. However, the court finds sufficient basis in the factors which have been considered by defendants in making their threshold determination that no impact statement is required to conclude that the decision must be set aside.

### Negative Declaration of Environmental Impact

■ Defendants further assert that a formal impact statement is not required since they have prepared a "negative declaration" of environmental impact of the Cane Creek project. A "negative declaration" is prepared in lieu of a formal impact statement when, in the opinion of the state conservationist, a project is assessed as having no significant impact on the environment. See Proposed SCS Reg. § 650.8(b)(3), 38 Fed. Reg. 31909, 31912 (1973), to be codified as 7 CFR § 650.8(b)(3). Although not as comprehensive as the formal impact statement, the "negative declaration" should set forth much of the same data, and is, in many ways, a "mini" impact statement. See Simmans v. Grant, 370 F.Supp. 5 (S.D.Tex.1974).*

In claiming to have prepared a negative declaration, defendants apparently refer to that portion of the Department of Agriculture's environmental statement which enumerates several adverse impacts of the Cane Creek project. While the court has some doubt that this environmental statement satisfies all the requirements of the negative declaration process, it would not, in any event, alter the court's conclusion that a formal environmental impact statement is what is called for by NEPA in this case.

### Conclusion

The court finds that the Cane Creek Improvement Project is a major federal action which will significantly affect the quality of the human environment in and around Cookeville, Tennessee. In accordance with the objectives and requirements of NEPA, defendants shall therefore be required to prepare a detailed environmental impact statement. To date, none has been prepared and there has been little effort by defendants to comply with the procedural requirements of NEPA in making plans for the development.

■ The court further concludes that continuation of the Cane Creek project need not be enjoined pending preparation of the impact statement. Project funds of approximately $1,000,000 are largely unspent, and construction contracts have not been let but are scheduled to be negotiated or bids received in the near future. The planning stage is essentially complete and a portion of the needed property has been acquired by condemnation. It appears reasonable to permit defendants to advertise the job for bids, execute contracts and finalize plans, subject to preparation of an environmental impact statement as herein required. However, any contracts executed should contain a provision that the contract is subject to the preparation of an impact statement and compliance with other provisions of NEPA.

Plaintiffs' suit for injunctive relief and relocation benefits shall be dismissed since plaintiffs have refused to negotiate with Cookeville officials and have further failed to exhaust available administrative remedies.

An order in accordance with the Memorandum shall be entered.

---

* At the time of the state conservationist's decision in 1971 that no formal impact statement was needed in the Cane Creek project, the negative declaration concept was yet to be adopted by the SCS.