**FRIENDS OF FIERY GIZZARD; Sierra Club; Tennessee Scenic Rivers Association; and Tennessee Citizens for Wilderness Planning, Plaintiffs,**

v.

**FARMERS HOME ADMINISTRATION; David Seivers, State Director of Farmer's Home Administration; Town of Tracy City; and Charles Fults, mayor of Tracy City, Defendants.**

No. 3–94–0620.

United States District Court, M.D. Tennessee, Nashville Division.

Oct. 6, 1994.

Wayne Edward Ramage, Farris, Warfield & Kanaday, Nashville, TN, for plaintiffs.

Michael L. Roden, Office of the U.S. Atty., Bennett L. Ross and Jessalyn Hershinger, Bass, Berry & Sims, Nashville, TN, for defendants.

## MEMORANDUM

WISEMAN, District Judge.

On September 29, 1994, this Court ruled from the bench, denying plaintiffs' motion for a preliminary injunction. The Court reserved the right to supplement its ruling with a memorandum opinion, and in accordance with that reservation, supplements its ruling with the following memorandum.

### I

■ In a motion for a preliminary injunction, four factors should be considered. First, and most important for our purposes, is the likelihood of success on the merits. Next, the court should consider the probability of irreparable harm if the injunction is not granted, whether the issuance of the injunction would harm others, and finally, the public interest. *Tyson Foods, Inc. v. McReynolds,* 865 F.2d 99, 101 (6th Cir.1989); *Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). Both parties acknowledge in their briefs that the first prong of this analysis is most relevant to the instant case, and so, the greater part of this opinion will address the likelihood of the plaintiffs prevailing on the merits.

### II

The standard of review for this case is clear. A federal district court reviewing the decision of an administrative agency plays a limited role. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 555, 558, 98 S.Ct. 1197, 1217, 1219, 55 L.Ed.2d 460 (1978). In the instant case, the decision in question was the decision of the Farmer's Home Administration (FmHA), after the performance of an Environmental Assessment (EA), that an Environmental Impact Statement (EIS) was not required. This decision took the form of a Finding of No Significant Impact (FONSI). It is not for this Court to substitute its judgment for that of the administrative agency. *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976). Decisions by administrative agencies regarding the performance of EAs and EISs are governed by Section 102(2) of

the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and the Administrative Procedure Act, 5 U.S.C. § 706, governs the review of agency decisions by federal courts. Courts interpreting these statutes have held that in accordance with the aims of NEPA, a court reviewing an agency's FONSI should focus on two factors. First, the court should decide whether the agency's decision was "arbitrary and capricious." 5 U.S.C. § 706; *Neighbors' Organized to Insure a Sound Environment v. McArtor*, 878 F.2d 174, 178 (6th Cir.1989). Second, the court should determine whether the agency took a "hard look" at the environmental consequences of the project in question, pursuant to the Council on Environmental Quality (CEQ) regulations, 40 C.F.R. § 1508. *Charter Township of Huron, Michigan v. Richards*, 997 F.2d 1168, 1175 (6th Cir.1993).

■ Plaintiffs argued that the decision of the FmHA that there was no significant impact was arbitrary and capricious because it did not take into account the significant beneficial impact of the provision of a long-term supply of water to the citizens of Tracy City. For the following reasons, this Court ruled from the bench that the existence of such a significant beneficial impact alone does not trigger the performance of an EIS. The applicable provisions do not support the plaintiffs arguments. The CEQ regulations provide in 40 C.F.R. § 1508.27(b)(1), that one of the ten factors that should be considered in evaluating the intensity of the significance of the impact is: "[i]mpacts may be both beneficial and adverse. A significant impact may exist even if the Federal agency believes that on balance the effect will be beneficial." As the FmHA argued in its brief, however, the kind of beneficial impact referred to by this language is not the same kind that is at issue in this case.

> Defendants concede that the benefits to the citizens of Tracy City may be subjectively significant to them (especially in times of drought). However, these are not the types of "environmental effects", which, if significant, require an EIS. Rather, they are benefits which relate to the stability and quality of life for the local citizenry. Simply put, a significant public

benefit does not, as plaintiffs contend, translate into a significant environmental impact requiring an EIS.

(Memorandum of Defendants, September 23, 1994, at 12). See also 40 C.F.R. § 1508.27(a), which defines the other aspect of significance (in addition to intensity), context.

A government agency will not agree to fund a project like the one in question in this case unless they believe there will be some beneficial impact resulting from it. As Defendants point out in their brief, "[t]o require an EIS every time the federal government attempts to improve one or more citizens' quality of life would lead to the preposterous result of requiring an EIS for any federal action." (Memorandum of Defendants, September 23, 1994, at 12). In fact, other factors should be balanced into this equation as well. The Seventh Circuit Court of Appeals has held:

> the statutory concept of "significant" impact has no determinant meaning, and to interpret it sensibly in particular cases requires a comparison that is also a prediction: whether the time and expense of preparing an environmental impact statement are commensurate with the likely benefits from a more searching evaluation than an environmental assessment provides.

*River Road Alliance, Inc. v. Corps of Engineers of the United States Army*, 764 F.2d 445, 449 (7th Cir.1985), *cert. denied*, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). Under this standard, in a case like the present one, where the only clear impact is a positive one that will have repercussions only within the context of Tracy City, the expenditure of time and money an that an EIS would involve is not merited.

Nevertheless, plaintiffs argued that Congress did intend that an EIS be performed in a situation where a significant beneficial impact exists, and they cited several decisions to support their argument. None of these cases, however, are binding on this Court. The following discussion will address the precedent cited, case by case.

First, plaintiffs cited *National Wildlife Federation v. Marsh*, 721 F.2d 767, 782–83 (11th Cir.1983), and *Environmental Defense*

*Fund v. Marsh,* 651 F.2d 983, 993 (5th Cir. 1981). Both of these cases can be distinguished because they addressed situations where, after an EIS had been performed, new information came to light and a party demanded a supplemental EIS. Moreover, neither of the courts in these two cases clearly stated that beneficial impacts merited an EIS in their own right. These cases merely stand for the proposition that beneficial impacts should be discussed in an EIS, and that NEPA is concerned with all significant impacts. *Id.* That is not the same as holding that in a case where no significant adverse impact exists at all, but a significant beneficial impact exists, an EIS must be performed. Plaintiffs also cited *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 424–25 (5th Cir.1973). In this case, the court raises a rhetorical question, in dicta, as to whether in a situation where there was no significant impact other than a beneficial one, an EIS was required. While the court suggested that the answer to that question might be "yes," it did not explicitly state as much, not even in dicta. *Id.*

In their supplemental memorandum, filed two days after the court's oral ruling on this issue, and requesting that the court reconsider its order, plaintiffs cited further authority. This court was not persuaded by this additional authority to reconsider its previous ruling. Primarily, plaintiffs relied on *Smith v. City of Cookeville,* 381 F.Supp. 100, 110–11 (M.D.Tenn.1974) (Morton, J.). In that case, the plaintiffs were two property owners who sought to enjoin the City of Cookeville and others from taking possession of their land through eminent domain and converting it to use as a conservation and recreation development. Plaintiffs alleged that an EIS was necessary because there would be a significant impact as a result of the conversion of the land for recreational use, which included flooding a large portion of it to make a lake. *Id.* at 101–2. The court held that there was a significant potential impact, in part because toxic substances from a nearby dump were likely to leak into the lake water and taint it. *Id.* at 106–7, 111. In spite of its conclusion that an EIS was warranted, however, the court refused to grant the plaintiff's motion for a preliminary injunction pending the performance of an EIS. *Id.* at 112. Nevertheless, in this decision Judge Morton did use language stating that beneficial as well as adverse significant impacts require the preparation of an EIS. *Id.* at 111.

Regardless, the procedural posture of this case is somewhat different from the instant case. In *Smith,* the decision not to perform an EIS was apparently not in the form of a formal FONSI based on an EA, but was the informal recommendation of the State Conservationist to the U.S. Department of Agriculture that an EIS was not necessary. *Id.* at 107–8. The agency later tried to designate this document to be a " 'negative declaration' of environmental impact." The court expressed doubt that this document was equivalent to a negative declaration, and proceeded to hold that the facts merited an EIS. *Id.* at 112. The court also held:

> it should be obvious that before a determination is made that the proposed project will not significantly affect the quality of the human environment, there must be a good faith effort to analyze in some detail the consequences which may be expected to affect the everyday living environment of the people in the project area.

*Id.* at 108. In the instant case, such a good faith effort was made in the form of a FONSI and an EA supported by an extensive administrative record. In *Smith,* no such effort was made. Thus, this case is clearly distinguishable from the instant case.

In addition, plaintiffs argued that the legislative intent of NEPA included a directive to perform an EIS where there was a beneficial impact. In support of this argument, the most frequently cited source is the plain language of Section 102(2)(C) of NEPA. This provision reads as follows:

> all agencies of the Federal Government shall—
>
> .      .      .      .      .
>
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). Contrary to the plaintiffs' suggestion, if this language indicates any intent at all with regard to beneficial and adverse significant impacts, it seems to differentiate between them, by emphasizing the importance of adverse impacts in subsection (ii), and failing to do the same for beneficial impacts.

Finally, a modicum of common sense should be applied to this exercise. An EA is designed to determine the need for the far more expensive and time consuming procedures of an EIS. 40 C.F.R. § 1508.9(a)(1); *River Road Alliance,* 764 F.2d at 449.[1] If an EA identifies significant adverse impacts from the project, an EIS is required. 40 C.F.R. § 1501.4(c). If both significant adverse and beneficial impacts are identified, the required EIS will balance the two and decide which weighs heaviest in the balance. 40 C.F.R. § 1508.27(b)(1). If only beneficial impacts are identified and no significant adverse impacts are noted, an EIS is unnecessary. Thus, the project may proceed to deliver the projected beneficial impacts, without incurring the delay and expense of an EIS, unless a court finds that the agency decision was arbitrary and capricious. Any other interpretation of this statutory scheme eviscerates the Environmental Assessment segment of the scheme. There should always be beneficial impacts to any project. The Congress was concerned, and these plaintiffs should

only be concerned, with impacts adverse to the environment. The Court observes that demanding an EIS can also be a ploy to effect delay and expense in an effort to make the agency change a decision. Urging the thesis that a beneficial impact alone triggers an EIS smacks of such a motivation. For these reasons, this Court refuses to reconsider its ruling that a beneficial impact, such as the provision of a water supply to Tracy City, can, by itself, trigger the requirement of an EIS. Therefore, despite the existence of a significant beneficial impact, this Court holds that the agency's decision that no EIS was warranted was not arbitrary and capricious.

■ Another way in which plaintiffs attempted to suggest that the FONSI was arbitrary and capricious was by arguing that one area of potential significant adverse impact was insufficiently addressed by the EA. Plaintiffs argued that the FmHA had not sufficiently examined the potential effect of the impoundment on the quality of the water in the Big Fiery Gizzard Creek. Plaintiffs relied on the testimony of their expert witness, Barry Wayne Sulkin, who testified that specific measures necessary to determine whether there would be a significant impact on the flow rate of the Creek had not been taken. Flow rate is an important factor in determining how an impoundment will change the depth and the turbulence of a creek which will, in turn, affect the growth of algae and hence the amount of oxygen in the water. This oxygen may be needed by organisms inhabiting the Creek. However, defendants were able to undermine this implication with the testimony of their witness, Bobby Nolen of Hendon Engineering Associates. He testified that his firm was hired by Tracy City to independently analyze the effects of the project on the environment at the site. He described the technique they used to determine the flow rate of the Creek. Mr. Nolen testified that he used the flow rate of the Elk River, the nearest river with a gaging station (a device for measuring flow rates that takes regular measurements over a peri-

---

1. "An environmental assessment is a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time consuming to prepare and has been the kiss of death to many a federal project—is necessary." *Cronin v. U.S. Department of Agriculture,* 919 F.2d 439 (7th Cir.1990).

od of time), to calculate the flow rate of the Big Fiery Gizzard Creek by comparison. They also took a single measurement from the Big Fiery Gizzard Creek, which, he testified, bore a positive correlation to the average measurement predicted by the Elk River comparison. While the plaintiff's expert witness, Mr. Sulkin, expressed doubts about the reliability of this method, Mr. Nolen testified that this was a scientifically valid method of determining flow rate, and that the experts from the Corps and the TVA used the same method. The Supreme Court has held that "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinion of its own qualified experts ..." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 395, 109 S.Ct. 1851, 1871, 104 L.Ed.2d 377 (1989). Based on this information, which is reflected in the administrative record, it is reasonable to conclude that the FmHA was not arbitrary and capricious in deciding that an EIS was not merited by the potential impact of the impoundment on the flow rate of the creek.

■ Additionally, plaintiffs attempted to suggest that the EA was inadequate in its alternatives analysis. The CEQ regulations mandate that the EA analyze and compare the alternatives to the proposed site. 40 C.F.R. § 1508.9(b). Plaintiffs' attorneys questioned the witnesses about the alternatives analysis used by the FmHA. Plaintiffs elicited the information that some of the costs used for the alternative sites were derived from the alternatives analysis done when the Sewanee Creek was the proposed site, and thus were about three years old. For some other sites, the costs used in the analysis were more current. Moreover, for the Big Fiery Gizzard Creek site the cost increase of $1.3 million was not reflected in the EA or its addendum. However, Mr. Nolen testified that when he did his assessment of the alternatives for Tracy City in the summer of 1993, the figures that he used for the costs of the sites were updated and took

inflation into account. He was able to articulate consistent explanations for the calculation of the costs for the Ramsey Lake and South Pittsburgh alternatives.[2] Furthermore, he testified that no alternative site was rejected merely for reasons of cost. Additionally, it is important to note that an increase in cost is not an impact on the environment. Therefore, it can also be reasonably concluded that in relying on the alternatives assessment provided by Mr. Nolen, the FmHA's decision was not arbitrary and capricious.

There can be no doubt that numerous federal and state agencies took a "hard look" at the probable or potential impacts of the construction of the dam and water treatment plant at the Big Fiery Gizzard Creek site. The FmHA was not alone in its conclusion that this project would result in no significant adverse impact on the human environment. Initially, of course, the Mayor and Aldermen of the Town of Tracy City had to approve the site before they proposed it. The Environmental Protection Agency (EPA) examined the site, as it had an earlier proposed site at Sewanee Creek. The EPA had determined the Sewanee Creek site to be a special aquatic site, and vetoed its use for the dam and water treatment facility. It made similar findings with regard to suggested sites at other locations, like Scott Creek and Holywater Creek. It did not, however, find the Big Fiery Gizzard Creek site to be a special aquatic site and did not veto its use.

■ Moreover, since the discharge of fill materials into waters of the United States requires a permit under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, the Army Corps of Engineers (the Corps) also extensively scrutinized the Big Fiery Gizzard Creek site, and it issued the permit. Additionally, the Town of Tracy City was required to obtain a Tennessee Aquatic Resources Alteration Permit (ARAP) from the

**2.** Plaintiffs lost considerable credibility on this issue by emphasizing the South Pittsburgh alternative as if it was a viable alternative. Using the South Pittsburgh facility as an alternative would involve transporting water from 40 miles away up a 1400 foot high mountain to Tracy City, which defendants' witnesses established would be extremely costly and would cause the environmental impact of burning an additional 1 million pounds of coal annually to operate such a system.

Tennessee Department of Environment and Conservation (TDEC) in order to build their dam. The TDEC inspected the Big Fiery Gizzard Creek site and accordingly issued the ARAP. In fact, at the suggestion of the Governor, TDEC appointed a special task force to inspect the Big Fiery Gizzard Creek project, including citizens, representatives of concerned groups, the E.P.A. and the Corps. This task force concluded that the site was the best available alternative for the project. This type of coordination of federal and state forces supports a decision not to prepare an EIS. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985) (where local, state and federal governmental officials agreed that the EA was adequate and that the proposed development involved no significant impact, this was a factor in support of the validity of that conclusion).

The Tennessee Valley Authority (TVA) also approved the dam construction plans. Furthermore, the Big Fiery Gizzard Creek project has been reviewed by the Fish and Wildlife Service of the U.S. Department of the Interior, and the Tennessee Historical Commission, both of which approved the project. Thus, this project and this site were thoroughly scrutinized by numerous agencies, both state and federal, all of which have reason to be concerned about the environment, and none of which opposed the Big Fiery Gizzard Creek site in any way. The FmHA noted the review and approval of this project by all of these agencies in the administrative record. The witnesses at the hearing from the FmHA, Morris, Puckett, and Mayberry, described how the EA was performed, and noted that information from all the above sources was examined in the process.

### III

Plaintiffs bring up several other issues, all of which, they argue, demonstrate that the EA was inadequate, and that the agency's decision not to perform an EIS was thus arbitrary and capricious. They argue that the FmHA was biased in favor of finding no significant impact, that there was inadequate documentation of several of the conclusions reached in the EA, and that the EA failed to address several potentially significant factors such as the increase in cost of the project from $3 million to $4.3 million, and the necessity of obtaining a National Pollution Discharge Elimination System (NPDES) permit. This court holds that none of these issues are significant enough to render the decision of the FmHA not to perform an EIS arbitrary and capricious. Therefore, the plaintiffs would not, based on any of the arguments they made in the context of this hearing, prevail on the merits. Hence, that factor of the test for issuing a preliminary injunction has not been met in this case. As for the other factors, they do not operate to support the plaintiffs' case. The plaintiffs have not established that the environment will be irreparably injured if an injunction is not issued at this point. The primary potential adverse impact which the plaintiffs argued might be imminent was the alteration of the flow rate of the Creek water, and this issue has been addressed above. In analyzing the third factor, the likelihood of harm to other parties if the injunction issues, this Court must take into account the great need of Tracy City for a long term water supply, and the lack of viable alternatives to this project. The fourth factor, the public interest, must also be considered in light of the town's need for water. Overall, it is clear that the plaintiffs' motion for a preliminary injunction should be denied.